## AFFIDAVIT IN SUPPORT OF
## SEARCH WARRANT APPLICATION

I, Jonathan A. Duquette, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain account that is stored at premises owned, maintained,

controlled, or operated by Twitter, Inc. ("Twitter"), an electronic communications service and/or

remote computing service provider headquartered at 1355 Market Street, Suite 900, San

Francisco, CA.

2.      The information to be searched is described in the following paragraphs and in

Attachment A. This affidavit is made in support of an application for a search warrant under 18

U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Twitter to disclose to the

government copies of the information (including the content of communications) further

described in Section I of Attachment B. Upon receipt of the information described in Section I of

Attachment B, government-authorized persons will review that information to locate the items

described in Section II of Attachment B.

3.      I am a Task Force Officer with the Federal Bureau of Investigation (FBI). I have

been in this position since June 2015, and I have been a Task Force Officer in FBI's Boston

Division since January 2018. I am also a Border Patrol Agent with the U.S. Border Patrol and

have been in this position since December 2009. In my career, I have utilized various

investigative tools and techniques, to include the use of search warrants.

4.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to

conduct investigations of and to make arrests for federal criminal offenses. I also am a "federal

law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.

6.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 875(c) (threatening interstate communications) have been committed by Brian Dennison, using the Twitter username @Ma1lus. I submit that there is also probable cause to search the location described in Attachment A for evidence of this crime, further described in Attachment B.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated."

## PROBABLE CAUSE

### REPORT OF THREAT ON TWITTER

8.      On September 8, 2021, at approximately 9:09 a.m., the FBI received information regarding a threat that had been made via the microblogging and social networking service Twitter. A Twitter user with the username @Ma1lus had been observed posting that he was building a pipe bomb and was going to kill Jews the following day with his AR-15.

9.      A review of the posts in question confirmed the content of the posts made by the Twitter user @Ma1lus:



### FOLLOW-UP INVESTIGATION

10.    On September 8, 2021, FBI personnel sent an emergency disclosure request to Twitter, requesting IP logs and subscriber information for the username @Ma1lus. Information provided by Twitter in response to the request included the following:

Username: Ma1lus

Account creation date: August 26, 2021

Phone number: 508-402-2741

User creation IP: 74.78.139.48

11.    Publicly available information showed that telephone number 508-402-2741 was assigned to Inteliquent, a provider of telecommunications services and a subsidiary of Onvoy, LLC. Information provided by Inteliquent in response to an emergency disclosure request showed that the number was assigned to an Inteliquent customer, TextMe, which is an application that permits mobile phone users to make free calls and texts using a phone number that TextMe provides.

12.    Information provided by TextMe in response to an emergency disclosure request showed that telephone number 508-402-2741 was assigned to username briandennison93707,

3

using the email address briandennison9@gmail.com. The last login into the account was on September 8, 2021, at 1:23 p.m. UTC.

13.     Twitter also provided a list of IP addresses used to log into the @Ma1lus account between September 6, 2021, and September 8, 2021. The following IP addresses were listed:

74.78.139.48

107.77.225.160

24.97.227.121

14.     Because IP address 74.78.139.48 had been used both to create the account and to log into it on September 8, FBI personnel sent an emergency disclosure request to Charter Communications, which was responsible for the address, to determine which Charter customer had been assigned the address on September 8 at 14:31:27 UTC, the most recent login into the account.

15.     In response to the emergency disclosure request, Charter reported that the IP address in question was assigned to Florice Dennison at 86 Fogg Road in Buxton. Publicly available tax assessment information for the town of Buxton showed that the premises at 86 Fogg Road in Buxton was owned by John L. Dennison.

16.     Publicly available online information showed that IP address 24.97.227.121, which also had been used to log into the @Ma1lus Twitter account, was assigned to Fairchild, at 333 Western Avenue in South Portland. Information provided by Charter in response to an emergency disclosure request confirmed this fact.

17.     Later on September 8, other FBI investigators and I went to 86 Fogg Road in Buxton to determine who resided there and hopefully learn more about who had posted the threat on Twitter. Investigators spoke with Florice Dennison, who stated that she lived at the residence

4

with her husband, son, daughter and grandchild. She said her 24-year-old son, Brian, lived in a separate unit above the garage, which was attached to the home. She said Brian worked nights at ON Semiconductor in South Portland.[1]

18.     Florice Dennison went into the house to the unit over the garage to wake up Brian so we could speak with him. Brian and Florice came outside and we attempted to speak with Brian. When we asked him if he would speak with us, however, he said he did not want to do so and asked us to leave.

19.     A short while later, we spoke with Florice who was accompanied by her husband, John Dennison, outside 86 Fogg Road. They told us that Brian had been obsessed with Jews for about three years, and that he believed Jews were responsible for all of his problems. They said they had many concerning conversations with Brian regarding Jews. They stated that he lived in the apartment above the garage and paid $600 per month in rent. They said he owned a few pistols and rifles, including an AR-15-style rifle, but did not keep them locked up. They said he never left the house unless he was going to work or to get food.

20.     On September 8, 2021, I obtained search warrants for the apartment above the garage at 86 Fogg Road in Buxton, Maine, and for the person of Brian Dennison.  On September 9, 2021, I obtained a second search warrant for the apartment above the garage at 86 Fogg Road, and search warrants for a 2016 Dodge Charger and for the residence at 86 Fogg Road.

21.     Among the items seized from Brian Dennison's apartment under the September 8 search warrant was an iPhone 11. The phone was powered on when investigators located it.

---

[1] I know from publicly available information that ON Semiconductor has a location at 333 Western Avenue in South Portland, and that prior to being affiliated with ON, the Western Avenue location was affiliated with Fairchild Semiconductor. ON acquired Fairchild in 2016.

22.     FBI Task Force Officer Maurice Drouin, who has received specialized training in the forensic analysis of cell phones and other electronic devices, analyzed the iPhone 11 seized from Dennison's apartment. I have spoken with Drouin regarding his analysis and reviewed a report he has generated describing his findings.

23.     According to Drouin's report, the Apple ID associated with the iPhone was briandennison9@gmail.com, and the device name was "Brian's iPhone." In reviewing Drouin's report, I found several items demonstrating that Brian Dennison was the individual who posted the threat on Twitter on September 8 as the user "Ma1lus." First, I found an instant message sent from +140404 to briandennison93707 via TextMe on September 8, 2021, at 9:23:38 a.m. (UTC-4).[2] Publicly available information on Twitter's website indicated that 40404 is a "short code" number belonging to Twitter. The message read, "Your Twitter confirmation code is 220485."

24.     As I noted in Paragraph 10, the TextMe username briandennison93707 is associated with telephone number 508-402-2741, which in turn is the telephone number associated with the Twitter username Ma1lus.

25.     In reviewing Drouin's report, I also found several images pertaining to the threat Ma1lus posted. One image appeared to be a screenshot that included the posted threat itself:

---

[2] All of the times I mention in this affidavit are in UTC-4, which at the time of the events discussed in this affidavit was the time being observed in the Eastern Time Zone as Eastern Daylight Time.



26.     I recognize this as a screenshot from within the Twitter iPhone application.

According to file information associated with the image, it was created on September 8, 2021, at

9:27:04 a.m. The image was deleted on September 8, 2021, at 11:53:06 p.m., a few hours after we left 86 Fogg Road on September 8. Although it was deleted, Drouin was still able to recover it from the phone using specialized forensic software.

27.     I also found another image, this one just of the posted threat:



28.     File information associated with the image showed that it was created on September 8 at 9:27:13 a.m., several seconds after the image discussed in Paragraph 23 was created.

29.     Finally, application usage logs on the iPhone showed that the Twitter application had been used on the phone on September 8 between 9:23:31 a.m. and 9:27:05 a.m., and between 9:27:13 a.m. and 10:13:07 a.m.

30.     On September 8, 2021, FBI personnel submitted a request under 18 U.S.C. § 2703(f) to Twitter, requesting the preservation for 90 days of all records pertaining to Twitter username @Ma1lus. On November 30, 2021, I submitted a follow-up a follow up request, asking that the information be preserved for another 90 days. On December 5, 2021, I received confirmation that reasonable steps had been taken to preserve the requested information.

## BACKGROUND CONCERNING TWITTER[3]

31.     Twitter owns and operates a social networking and microblogging service of the same name that can be accessed at http://www.twitter.com and via the Twitter mobile application ("app"). Generally, Twitter allows users to register and create an account; to personalize (if desired) an account profile page; and to send and receive communications via the platform. These functionalities are discussed in more detail below.

32.     Twitter permits its users to communicate via messages that can contain photos, videos, links, and/or a maximum of 280 characters of text. Users can choose to share these messages, called "Tweets," with the public or, alternatively, to "protect" their Tweets by making them viewable by only a preapproved list of "followers." Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Users can also Tweet a copy of other Tweets ("retweet") or Tweet a reply to another Tweet. Users can also indicate that they like a Tweet by clicking on a heart icon that appears next to each Tweet on the platform.

33.     Twitter also permits its users to exchange private messages, known as "direct messages" or "DMs," with other Twitter users. DMs, which also may include photos, videos, links, and/or text, can only be viewed by the sender and designated recipient(s). Direct messages may be sent to an individual user or to a group of up to 50 Twitter users. Twitter users have the ability to choose whether they can receive a direct message from anyone. At any time, a Twitter user has the ability to alter the settings on their Twitter account so that they can receive direct

---

[3]     The information in this section is based on information published by Twitter on its website, including, but not limited to, the following document and webpages: "Guidelines for law enforcement," available at https://help.twitter.com/en/rules-and-policies/twitter-law-enforcement-support, "Using Twitter," available at https://help.twitter.com/en/using-twitter, and "New user FAQ," available at https://help.twitter.com/en/new-user-faq.

messages only from (1) individuals to whom the user has already sent a direct message and (2) Twitter accounts that the user "follows" via his account.

34.     While individuals are not required to register with Twitter to view the content of unprotected Tweets, individuals must register for a Twitter account to send Tweets, to "follow" accounts in order to view protected Tweets, and to send and receive direct messages. A user may register for an account for free by visiting Twitter's website or via the Twitter app. When a user creates a new Twitter account, Twitter assigns that account a unique user ID ("UID"). A user must also select a password as well as a unique Twitter username (also known as a "handle"). Twitter then appends the @ symbol in front of whatever username the user selects to create the Twitter username (for example: @example). The user may also select a different name (the "display name"), which is not automatically preceded by the @ symbol, to be displayed on his profile picture and at the top of his Tweets alongside his Twitter username.  The display name can include symbols similar to emojis. The user can change their password, username, and/or display name at any time, but the UID for the account will remain constant.

35.     While anyone can sign up and use Twitter for free, as of November 2021 Twitter also offered a subscription model that offered users access to additional features and app customizations. This new subscription is called Twitter Blue. A user can sign up for Twitter Blue at any time.

36.     At the time of account creation, Twitter asks the user for certain identity and contact information, including: (1) name; (2) email address and/or telephone number; and (3) month and year of birth. Twitter also keeps certain information relating to the creation of each Twitter account, including: (1) the date and time at which the user's account was created; and (2) the method of account creation (e.g., website or Twitter app).

37.     Upon the creation of a Twitter account, a generic profile page is automatically created for the user. This page displays information including (1) the user's Twitter username; (2) the display name; (3) the number of Twitter accounts the user is following; (4) the number of Twitter accounts that are following the user; and (5) Tweets sent by the user (although, as noted above, if the user has chosen to protect their Tweets they will be visible only to preapproved "followers"). The user can personalize this page by posting a personal picture or image (known as an "avatar") to appear on the page and/or a banner image to appear across the top of the profile page. The user can also add text to create a short biography, to identify his location, to provide a link to his website, or to specify his date of birth.

38.     As noted above, Twitter users can use their account to send and receive communications. If a Tweet includes a Twitter username that is preceded by the @ symbol, that is referred to as a "mention." The Twitter user mentioned in the Tweet will receive a notification informing them that they have been mentioned and showing the content of that Tweet. Similarly, if another Twitter user replies to a Tweet sent by a user, the user who sent the original Tweet will receive a notification that someone replied to their message, and the notification will show the content of that reply.

39.     Twitter users can also include links to webpages in their Tweets and Direct Messages. Twitter automatically processes and shortens links provided by the user to a shortened link that starts http://t.co/. Twitter tracks how many times these shortened links are clicked.

40.     A registered Twitter user can also "like" a Tweet by clicking a heart icon on a Tweet sent by another user. If another user "likes" a Tweet that is posted by the Twitter user, a notification will appear in the user's account identifying what Tweet was liked and who liked it.

41. As noted above, users can include photographs, images, and videos in their Tweets. Each account has a "media timeline" on their profile that displays "the photos, videos, and GIF's [the accountholder] has uploaded with [their] Tweets." An individual can view a Twitter user's media timeline by visiting the user's Twitter profile page.

42. Twitter users can also opt to Tweet with their location attached. This functionality is turned off by default, so Twitter users must opt-in to utilize it. However, if a Twitter user enables Twitter to access their precise location information, the Twitter user will have the option of attaching their location (e.g., the name of a city or neighborhood) to a Tweet at the time it is sent. If the user uses Twitter's in-app camera to attach a photo or video to the Tweet while the functionality is enabled, the Tweet will include both the location label (e.g., the name of a city or neighborhood) of the user's choice as well as the device's precise location in the form of latitude-longitude coordinates. The user can turn this functionality off (thereby removing their location from their Tweets) at any time, and they can delete their past location data from Tweets that have already been sent.

43. A Twitter user may choose to "follow" another Twitter user. If a Twitter account is unprotected (i.e., privacy settings have not been enabled), the user can follow another user simply by clicking the "follow" button on the other user's Twitter profile page. If a Twitter account is protected (i.e., privacy settings have been enabled), the user can follow another user by clicking the "follow" button and waiting for the other user to approve their request. Once an account is followed by a Twitter user, the Tweets posted by the account the user follows will appear in the user's Twitter Home timeline. Every time a Twitter user follows another account, Twitter sends a notification to the account being followed to inform them about the new follower. Each user's Twitter profile page includes a list of the people who are following that

user and a list of people whom that user follows. Twitter users can "unfollow" other users whom they previously followed at any time. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting based on the types of accounts that the user is already following and who those people follow.

44.     A Twitter user can also "block" other Twitter users. This prevents the blocked account from contacting or following the user or from seeing the user's Tweets. Twitter does not notify the user of a blocked account when another Twitter account blocks them.

45.     A Twitter user can also use Twitter's integrated search function. When a user types a search term into Twitter's search tool, it will return results that include accounts, Tweets, and photos that match that search term. Twitter users using the service via the Twitter mobile app also have the option of saving searches that they have performed. A user can delete such saved searches at any time.

46.     A Twitter user can also join or create "Lists" of other Twitter accounts. These Lists often organize Twitter accounts by group, topic, or interest. Viewing a timeline of a specific List will show you a stream of Tweets made only by accounts that are on that List. Users can pin their favorite lists to their Twitter Home timeline page. Twitter users have the ability to remove their accounts from Lists upon which it may appear.

47.     Twitter also offers a functionality called "Spaces," which it calls "a new way to have audio conversations on Twitter." Any user can create a Space; that user is referred to as the "host." Spaces are public, so anyone can join and listen to the conversation within a Space once it is created, although a user can send another Twitter user a link to their Space and invite them to join. By default, the only individuals permitted to speak in a Space are the individuals that the

host invites to do so, although this setting can be modified to allow a broader set of individuals to speak. Up to 13 people can be in a Space at a given time.

48.     Twitter also offers the ability to sign into third-party apps and websites using one's Twitter account. Typically, the third-party app or website will have a link that enables the user to sign into the third-party service using their Twitter account. Doing so grants the third-party service access to the Twitter user's account. Depending on the authorizations the Twitter user gives to the third-party service, the third-party service may be able to read the user's Tweets, see who the user follows on Twitter, post Tweets to the user's profile, or access the user's email address. A user can revoke a third-party app or website's authorization to access their Twitter account and associated data at any time.

49.     Twitter collects and retains information about a user's use of the Twitter service, to include: (1) content of and metadata relating to Tweets and Direct Messages; (2) photos, images, and videos that are shared via Twitter and stored in the user's Media Timeline; (3) the identity of the accounts that a user follows and the accounts that follow the user's account; (4) the content uploaded to a user's profile page, including their avatar, banner image, and bio; (5) information about Tweets the account has liked; (6) information about Lists associated with the account; (7) information about the Spaces that a user has participated in, including the host of the Space, its start and end times, and information about other attendees; and (8) applications that are connected to the Twitter account. Twitter also collects and retains various other data about a user and his/her activity, including:

      a.   logs of Internet Protocol ("IP") addresses used to login to Twitter and the timestamp associated with such logins;

14

    b.   transactional records reflecting, for example, when a user changed their display name or email address;

    c.   the identities of accounts that are blocked or muted by the user; and

    d.   information relating to mobile devices and/or web browsers used to access the account, including a Twitter-generated identifier called a UUID that is unique to a given device.

50.     In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

51.     Additionally, providers of electronic communications services and remote computing services often collect and retain user-agent information from their users. A user agent string identifies, among other things, the browser being used, its version number, and details about the computer system used, such as operating system and version. Using this information, the web server can provide content that is tailored to the computer user's browser and operating system.

52.     In my training and experience, evidence of who was using a Twitter account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United

States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

53.     Based on my training and experience, direct messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Twitter account may provide direct evidence of the offenses under investigation.

54.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Twitter can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geolocation, date and time) may be evidence of who used or controlled the account at a relevant time. Similarly, device identifiers and IP addresses can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

55.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

56.     Other information connected to the use of an account may lead to the discovery of additional evidence. For example, accounts are often assigned or associated with additional identifiers such as account numbers, advertising IDs, cookies, and third-party platform subscriber identities. This information may help establish attribution, identify and link criminal activity across platforms, and reveal additional sources of evidence.

57.     Therefore, Twitter's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Twitter. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **CONCLUSION**

58.     Based on the forgoing, I request that the Court issue the proposed search warrant.

59.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Twitter. Because the warrant will be served on Twitter, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Jonathan A. Duquette
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on March 4, 2022.

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: _____Mar 04 2022_____

City and state: _____Portland, ME_____

_____
Judge's signature

John H. Rich III, U.S. Magistrate Judge
Printed name and title

18